THE COMMERCIAL INSURANCE COMPANY

*v.*

JOHN C. MEHLMAN.

48  313
26a  72
48  313
54a  104
48  313
75a  213
48  313
100a  557

1. PLEADING AT LAW—*oyer.* Oyer cannot be craved of an instrument not under seal.

2. VENUE—*corporation entitled to a change of venue.* A corporation is entitled to a change of venue, equally with individuals, whenever by petition, verified by affidavit, it brings itself within the requisitions of the statute.

3. SAME—*application for change of by corporation—who may make the requisite affidavit.* In applications for change of venue by corporations, any recognized officer of the corporation, is to be regarded as a party to the record for the purpose of making the requisite affidavit.

4. INSURANCE—*the policy and its conditions—prohibited articles.* Where by the conditions of a policy of insurance, saltpetre could not be kept on the premises without the written consent of the company, and the proof showed that the assured kept it on the premises, in a keg, and on sale as an article of merchandise; *Held,* that this was a violation of the contract of insurance, and vitiated it.

5. SAME—*of the erection of additional buildings—not a change material to the risk.* Where a policy of insurance provided, that "any change within the control

40—48TH ILL.

of the assured, material to the risk, without written permission herein, shall avoid this policy," and by a subsequent clause it was made optional with the company to terminate the policy, in the event of the erection of additional buildings, by giving notice to the assured: *Held*, that the " change " alluded to had reference only to police regulations made to prevent accidents from fire, and not to the erection of additional buildings.

6. SAME—*concerning prohibited articles.* And in such case, it is error for the court to instruct the jury to the effect, that if the company knew the character of the business to be carried on, when it took the risk, it must be held to have taken the risks usual in such business; it appearing by the proof not only that it was of at least doubtful necessity for the assured to keep any saltpetre on hand, to carry on his business, but that he kept the prohibited article *on sale.*

APPEAL from the Superior Court of Chicago.

The opinion fully states the case.

Mr. A. C. STORY, for the appellant.

Mr. J. V. LEMOYNE, for the appellee.

Mr. CHIEF JUSTICE BREESE delivered the opinion of the Court:

This was an action of assumpsit, on two policies of insurance, brought by John C. Mehlman, against the Commercial Insurance Company, in the Superior Court of Chicago, at the April term thereof, 1866.

One of the policies was dated September 11, 1865, for six hundred dollars, upon the defendant's " one story frame building," the other dated 9th of October, 1865, for one thousand dollars, " upon his stock of groceries and provisions," and four hundred dollars " upon his stock of meat."

Both policies contained this condition:

" This policy shall be vitiated by keeping gunpowder, saltpetre, fireworks, naptha, benzine, camphene, turpentine, burning fluid, spirit gas, crude oil or petroleum, or refined

coal or earth oils, or kerosene, in quantities exceeding five barrels, or any other articles subject to legal or police restrictions, on the premises, without written consent hereon; or for neglect or deviation from any of the laws or police regulations made to prevent accidents from fire; any change within the control of the assured, material to the risk, without written permission hereon, shall avoid this policy."

There were two counts in the declaration, to which defendants pleaded the general issue, and eleven special pleas, on all which issues of fact were made up. The defendants then presented their petition, subscribed and sworn to by their secretary, who stated in his affidavit that he had the control of the case and had employed the counsel, for a change of venue, on the ground that the inhabitants of Cook county were prejudiced against the company, and for that reason they could not expect a fair trial of the cause in that county. The petition states that defendants had no knowledge, and did not hear or learn of the existence of those facts and prejudice, until Thursday, the seventh day of June, 1866, nor did knowledge thereof come to any of the attorneys or officers thereof, until that time. They therefore prayed that an order might be made changing the venue to the circuit court of some county where the causes complained of did not exist, &c.

The court refused the petition, to which the defendants excepted. A jury was sworn, and a verdict rendered for the plaintiff. A motion for a new trial was overruled, and judgment rendered on the verdict, to reverse which, defendants appeal to this court.

The first point made by appellants, assigning error on the refusal of the court to grant oyer prayed of the policies, has no foundation, as oyer is never granted of instruments not under seal.

The next point is, the refusal of the court to award a change of venue on the affidavit of the secretary of the company.

It is insisted by the appellee, that the application for a change of venue was discreditable to the company, a rich and powerful corporation, litigating with a poor man not possessed of the means required to convey his witnesses to another county. The same may be the case when a rich man is contending at law with a poor man—either can avail of the law, irrespective of the hardships that may ensue. Appellee insists that the application was not sufficient under the statute; first, because it was not made by the defendants, but by an agent, and cites the case of *Crowell* v. *Maughs*, 2 Gilm. 421, in which an agent of the party petitioning for a change of venue, made the application and affidavit. The court said, and very pro· perly, that the statute only authorizes the parties to obtain a change of venue, and the application must be made by a party to the record, the petition being verified by his affidavit. The statute does not include persons out of the record, nor allow them to swear to the petition as agents or otherwise.

It will be well to consider this objection in connection with the second made by the appellee, which is, that the law did not intend such an application should be made by a corporation.

These are the several objections urged by appellee against the application for a change, and if valid, very important interests of the State, the corporate interest, are in a degree outlawed. Why should not corporations have the same privilege of protection from prejudice as a natural person? Are their chartered rights and pecuniary interests less to be regarded than those of the individual? If so, why so? No good reason can be assigned why corporations should not have the benefit of this law equally with individuals. ·It is true they are not expressly embraced by name in the statute, but courts sit to administer the law, us well in its spirit as in its words. Parties to a suit, either party, may make the applicacation. This corporation is one party, and the only real question is, how, being a party, can it make the requisite

affidavit.   We have no decided case in point, but we know a corporation can only act by its officers and agents, and the spirit and reason of this law would require us to regard a recognized officer of a corporation as a party *pro hac vice.*. Suppose a corporation is sued or suing, desires a continuance, or is summoned as a garnishee in a case, who, but an officer of the company, having charge of its business, could make the affidavit in the first case, or answer interrogatories in the other? And we are not without authority in regard to the last proposition.   In the case of *Oliver* v. *The Chicago & Aurora Railroad Company*, 17 Ill. 587, which was where a judgment had been recovered before a justice of the peace against the company, and an appeal taken to the circuit court, the only question considered was whether the answer made by the garnishee was sufficient.   The court say, the garnishee was a corporate company, created by the laws of this State, necessarily performing all its functions and acts through its agents and representatives.   The answer was signed by Mr. Hall, the secretary and treasurer of the company, and under its corporate seal, but was not sworn to by any one.   This was not a compliance with the statute; that requires the answer to be sworn to in all cases.   And the court say, " In this case it is true the corporation could not in person swear to the answer, but it could have been sworn to by the proper officer or agent of the company, knowing the facts, which would have been a substantial compliance with the statute.   The same reasoning will apply in this case.

This court has decided that an action for assault and battery will lie against a corporation.   *St. Louis, Alton & Chicago R. R. Co.* v. *Dalby*, 19 Ill. 353.   Would it not be an intolerable hardship and gross injustice to a corporation thus sued in the home court of the party injured, and he possessing great influence in his county, personal and otherwise, that the corporation should be deprived of the right to take the suit to another county, where the parties would be upon more equal grounds,

318          COMMERCIAL INS. CO. *v.* MEHLMAN.          [Sept. T.,

Opinion of the Court.

where this influence did not prevail. No party to a suit can be deprived of the benefit of this law, if it is administered in its spirit. There is no doubt, that in very many cases these applications are made for sinister purposes, but that is a fact and an argument for the law-making power. Courts must administer the law as it is, according to its letter, spirit, and obvious meaning and intention.

But this reasoning is, perhaps, unnecessary, as the statute referred to by appellant, covers the whole ground. In ch. 90, Scates' Comp. 722, § 29, it it is declared that the word "person" or "persons," as well as all words referring to or importing persons, shall be deemed to extend to and include bodies politic and corporate, as well as individuals.

The word "parties," in the venue act, refers to and imports persons most certainly, and includes this corporation.

This point is well taken by appellants.

Appellants further insist, that an avoidance of the policy was shown by the proof that appellee kept saltpetre in the building, contrary to the express terms of the policy.

To rebut this, appellee proved it was customary in meat houses to keep saltpetre, to be used in the preservation of meats—from one fourth to one pound a month, being usual for such purpose.

Admitting this, and that such custom can overrule the terms of the policy, the proof goes much further, and establishes the fact, that the assured kept it in a keg on sale, as an article of merchandize. This was clearly in the face of the policy, and vitiated it. Whether saltpetre will explode or not, may be a vexed question, and whether dangerous or not, is immaterial; the agreement was, that the assured should not keep it, and if he did, the policy should be vitiated, and he must be held to the agreement. In the case of *Mead* v. *Northwestern Ins. Co.*, 3 Selden N. Y. 530, where one of the conditions of the policy was, "Camphene cannot be used in the building unless by special permission in writing, &c.," and defendants proved

that camphene had been used in the building, but it was shown it had been taken out before the fire, it was held, that the clause was a prohibition forming a part of the contract of insurance, and if violated, whether that effected the risk or not, the policy was avoided, and it was immaterial whether the subject of the breach continued up to the time of the loss or not. The same point was decided in *Westfall* v. *Hudson River Fire Ins. Co.*, 2 Kernan, 289.

Where it was known to the insurance agent, at the time the policy was effected, that the assured kept a prohibited article, and intended to keep it, in the building insured, the keeping it would not render the policy void, whether permission to keep it was endorsed, or intended or neglected to be endorsed. *Peoria M. & F. Ins. Co.* v. *Hall*, 12 Mich. 202.

As to knowledge in this case, it may be conceded the agent knew a small quantity of saltpetre was kept in every meat shop, a few ounces of which were used monthly to preserve the meat. It was proved, however, he had a keg of it nearly full, and dealt in it, on one occasion at least, as an article of merchandize. This avoided the policy. It is absurd to say, such a contract can be entered into and its terms avoided, or evaded, at the will of one of the parties, without the consent of the other.

It is further objected by appellants, that the policy was vitiated in another respect, and that was in the erection of the shed on the rear of the insured premises, in which he kept a stove and kettle which he used for cooking sausages and rendering lard. This shed, with its appurtenances and uses to which it was applied, it is contended, were an important change in the conditition of the premises, wholly within the control of the assured, and, as was proved by practical firemen, material to the risk, that being increased thereby.

Reference is made in support of this point to this clause in the policy, which closes the particular statement of the causes which shall vitiate the policy, a part of which, relating to

320          COMMERCIAL INS. Co. v. MEHLMAN.          [Sept. T.,

Opinion of the Court.

gunpowder and saltpetre, we have quoted, and concludes, " any change within the control of the assured, material to the risk, without written permission herein. shall avoid this policy." What " change" is here alluded to, or was in contemplation of the parties, is not entirely clear, but interpreting it by the position in which the clause is found, and its connection with the previous part of the sentence, we must suppose that change in police regulations made to prevent accidents from fire, and which the assured might control, and material to the risk, would, without the written permission of the assurer avoid the policy. It could hardly mean a change in the condition of the premises by the erection of buildings on the premises, for that is distinctly provided for in a subsequent clause of the policy, reading thus : " If, during the insurance, the risk shall be increased by the erection of buildings, or by the use or occupation of neighboring premises or otherwise; or, if the company shall so elect, it shall be optional with the company to terminate this insurance at any time, by giving notice to the assured or his representatives, of its intention to do so, and returning, or offering to return, the unearned premium."

It would seem, from this provision, an avoidance of the policy did not follow the erection of this shed, although the risk was thereby increased. The company had their election, by reason thereof, to terminate the policy, on notice to the assured.

The next point made by appellants, is upon the instructions.

The appellants complain that the first nine instructions asked by them were refused. Perhaps the 8th and 9th should have been given, but as the court gave instructions marked 1, 2 and 3, for defendant, they sufficiently stated the law as applicable to the case, and no injury has been done appellant by refusing the 8th and 9th instructions.

It is complained also, by appellants, that the instructions given for plaintiff, marked 4, 5 and 6, were wrong, and should not have been given.

The fourth instruction is as follows:

"4. If the insurance company knew the character of the business the plaintiff intended to carry on, and with such knowledge made the policies, they must be held to have taken the risks usual in that business; and if the jury believe from the evidence that the plaintiff did keep saltpetre on the premises in question, this is not a good defense to this action, if the jury believe from the evidence that said article is generally and necessarily used in the business he was carrying on, and that the quantity kept was not unreasonable for such use."

This instruction, under the testimony given, was well calculated to mislead the jury, for, though it may be true, an insurance company knowing the business of the assured, calculates the risk usually attendant on the business, and though the assured may keep articles necessary to carry on such business, though proscribed by the policy, it is not true he may keep them for sale. The proof in this case, by Mary Thaler, was, that she had bought saltpetre there—it was kept in a keg, and was pretty full when she bought some. George Petermichle, says he is a butcher, and sold beef to plaintiff, and says the plaintiff's business was that of a butcher, in which he is contradicted by all the facts in the case, and by plaintiff's own representations in effecting the policy. He did not butcher meats, but kept a meat shop where meats were sold. In answer to the question, if it was necessary for a meat market ordinarily to have saltpetre on the premises, he answered: "Every butcher must keep saltpetre," and in stating the purpose for which it is kept, he said, "saltpetre is used to keep meat longer," and concludes by saying, plaintiff kept groceries and a meat market. Thomas Webb said he was a butcher, and
41—48TH ILL.

that saltpetre is not necessary in a meat store, but we use it to give redness and firmness to the meat. In an ordinary butcher shop, he would use about a pound a month. In my market, I don't use that much, take the year round. Now, I don't use more than half that quantity.

William Stanly is a butcher, and he said he did not think saltpetre was a necessary article in a butcher's shop, but as a general thing, butchers use it more or less; he used in his shop five or six cents worth a month—about four ounces ; does as much business as any shop on the west side ; does not think it necessary to keep a keg of it on hand.

As the court, in the instruction, did not define what was a reasonable quantity of saltpetre to be kept on hand, the jury should have looked to the testimony where they would have found, that it was of at least doubtful necessity to keep any on hand, and certainly quite unreasonable, and in violation of the policy, to keep a keg of it, and that, too, as an article of merchandize. This instruction should not have been given in the terms in which it was given.

The most of the above considerations will apply to the fifth instruction, and it should not have been given without explanation.

The sixth instruction refers to the provision in the policy, that the plaintiff might complete the buildings, the risk, when taken, being only a carpenter's risk, and it tells the jury the plaintiff had a right to complete it in the usual way, without defining what that way was, and in the absence of all proof on that point. The whole instruction is calculated to mislead, for, starting out on the hypothesis that the main building, which was all the building that was insured by either policy, was the one he had a right to complete in a reasonable time, it closes by telling the jury it is for them to say, from the evidence, whether the shanty or shed was fairly to be considered as a part of the work of completing, not the building then in course of erection, but " the premises," under which general

and comprehensive term might be included a dozen buildings on the same lot of ground. But, as we have before said, if the erection of this shed increased the risk, all the remedy given by the policy, was to notify to the assured the election of the company to terminate the policy, and as that was not done, the company, by their own agreement, took the hazard.

Entertaining these views of the case, the judgment must be reversed, for the reasons given, and the cause remanded for further proceedings consistent with this opinion.

*Judgment reversed*