193     385
e106a¹465

The West Chicago Street Railroad Company

*v.*

Jessie Tuerk.

*Opinion filed December 18, 1901.*

1. Negligence—*when instruction in negligence case is properly refused.* In an action against a street railway company by a passenger injured as the result of a collision with a wagon, it is not error to refuse an instruction that, as the driver of the wagon knew the defendant's train was traveling in the same direction he was driving, it was immaterial whether the bell was sounded or not, since the duty of the defendant to the plaintiff, as a passenger, cannot be measured by the relative rights of the company and such driver.

2. New Trial—*what not ground for new trial.*   The fact that one of the jurors in a personal injury case may have had a suspicion that another juror had been tampered with by the defendant company or some one in its interest is not ground for new trial, where it is not shown that the juror communicated his suspicion to any other juror or that it in any way affected the verdict, nor that there was any ground upon which such suspicion could be based.

*West Chicago Street Railroad Co.* v. *Tuerk,* 90 Ill. App. 105, affirmed.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. SAMUEL C. STOUGH, Judge, presiding.

JOHN A. ROSE, and LOUIS BOISOT, Jr., (W. W. GURLEY, of counsel,) for appellant.

FRANCIS J. WOOLLEY, for appellee.

Mr. JUSTICE RICKS delivered the opinion of the court:

Jessie Tuerk, appellee, recovered a judgment against appellant in the superior court of Cook county for personal injuries received while a passenger on one of its street cars, in the city of Chicago. The injury was the result of a collision between the street car and a buggy being driven by one George F. Sweeney on Milwaukee avenue. The car was a grip-car, and Sweeney was driving in the same direction that the car was running, and was obliged, because of repairs taking place in the street, and mortar boxes and other things connected therewith obstructing the travel, to drive on to the appellant's tracks, and ahead of the street car, and following the track for some distance. The car, while running at a high rate of speed, overtook and ran into the buggy, and in the collision the buggy was so thrown around that one of the wheels struck appellee, riding in the car, and inflicted the injury complained of.

The declaration contained one count, averring that the plaintiff was a passenger on the car owned and operated by appellant, and that the defendant so carelessly and negligently ran and operated the said car that it came in collision with a certain buggy, whereby plaintiff was injured, stating the injury and averring due care on her part. Sweeney testified that he heard no warning of any kind, and witnesses on each side testified *pro* and *con* as to the ringing of a bell. Among other instructions, appellant offered the following:

"The uncontradicted evidence in this case is that Sweeney, the driver of the buggy in question, knew that the train of defendant was traveling in the same direction he himself was driving, and it is therefore immaterial whether the bell on the train was or was not sounded."

This instruction was refused. Appellant made a motion for a new trial, insisting that the refusal of this instruction was error, and also insisting that a new trial should be granted because of certain developments concerning the jury.

The trial lasted about eight days, and during its progress one E. B. Mesirow received an envelope through the mail, marked "Personal," opening which he found a letter addressed to "Mr. F. J. Woolley, 84 LaSalle," which he took and delivered personally to appellee's attorney. This letter was as follows:

"DEAR SIR—Should there be a disagreement in the case of Mrs. Tuerk, it will only be on account of Mr. Korf, a liveryman acting as a juror. I suspect him to be bribed since Friday evening by the R. R. St. Co.      Yours,      AN HONEST MAN."

*March 27, '99.*

This letter was delivered to Mr. Woolley some time before the trial was concluded. He made no mention of it to any one, so far as is shown by the record, until after the verdict was rendered and the jury discharged, when, it was shown by affidavit, one George M. Biddy, who was one of the jurors that tried the cause, approached Mr. Woolley and asked, "Did you get that letter?" Woolley replied, "I did get an anonymous letter," and thereupon Biddy replied, substantially, "That is the one I mean." This matter was also urged as a ground for a new trial, and the conversation between Biddy, the juror, and Woolley, the attorney, was proved by the affidavit of George W. Cutmore, another juror in the case, who overheard it.

Joseph B. Mann, who tried the case for the appellant, made affidavit that he had no knowledge of any juror having any improper information imparted to him, or

that said Woolley had received the letter mentioned in Cutmore's affidavit, until after the trial was over. Mesirow made affidavit as to the receipt of the letter by him by due course of mail and delivery of the same to Woolley, and that he had no knowledge of the author of it, and never, at any time, had any conversation with any member of the jury, or spoke to one, and had no reason to suppose that it was written by any member of the jury, and further, that he was not acquainted with the jury or any member of it. Biddy, the juror who was alleged to have made the inquiry of Woolley, made an affidavit, in which he stated that he did not write the letter, had no knowledge by whom it was written, and that neither Woolley nor any other party upon either side of the case had any communication with him in reference to the case until after the verdict was read in open court. Woolley, appellee's attorney, made an affidavit, in which he stated that Dr. Elias B. Mesirow handed him the anonymous letter above referred to, on or about the 28th of March, 1899; that he made inquiry of several persons in the witness room, endeavoring to learn who was the author of the letter, without success, and after the verdict had been rendered he inquired of several of the jurors who served on the case as to how Korf had voted, and mentioned to them that he had received an anonymous letter warning him against Korf; that in each instance he was advised that Korf had uniformly voted in favor of appellee; that among other jurors he spoke to Biddy regarding this letter, and was also informed by Biddy that Korf had voted always 'in favor of appellee. He denies that the conversation was as detailed by juror Cutmore, but states that Biddy asked him if he received a letter, and that he answered that he had received an anonymous letter warning him against Korf. He further states that this conversation was fifteen hours after the verdict had been signed and sealed and a short time after it had been presented to the court and read; that he never, at any time

prior to the reception of the verdict in court, directly or indirectly, had any conversation with any of the jurors, and had no knowledge as to who was the author of the anonymous letter, and had no reason to suspect that the same was written by any juror.

The case was taken to the Appellate Court for the First District, and there affirmed, and thence comes to this court. The errors relied upon are only two: the refusal of the instruction above set forth, and the refusal to grant a new trial upon the foregoing affidavits relative to the anonymous letter.

The gist of the refused instruction is, that Sweeney knew that appellant's train was traveling in the same direction he was driving, and that therefore it was immaterial whether the bell or gong on the train was sounded or not. The evidence showed that Sweeney had driven several blocks along the same avenue that appellant's train was running; that he would sometimes be behind appellant's train and sometimes ahead of it; that most of the time he was out of the track; that he was driving rapidly and sometimes passed the train and sometimes was passed by it, and that shortly before the accident, because of obstructions in the street, he was obliged to drive on the track to pass along the street. There is conflict in the evidence as to whether he was turning in or out of the tracks when struck by the grip-car. If Sweeney, instead of appellee, had been the plaintiff in this suit, it may be there was such knowledge brought home to him that he would have been deemed in law to have not exercised ordinary care for his own safety, because of his knowledge of the presence of appellant's train or its proximity to him, and that under such state of the case would not have been in a position to insist that the mere failure of appellant to sound the bell was negligence, inasmuch as he might be deemed to know of just what the sounding of the bell would inform him, and in such case the authorities cited and relied on by appel-

lant would be applicable.  The authorities relied on by appellant are *West Chicago Street Railroad Co.* v. *Coit,* 50 Ill. App. 640, *Williams* v. *Chicago and Alton Railroad Co.* 135 Ill. 491, *Chicago, Rock Island and Pacific Railroad Co.* v. *Bell,* 70 id. 102, *Theobald* v. *Chicago, Milwaukee and St. Paul Railway Co.* 75 Ill. App. 208, and *Bjork* v. *Illinois Central Railroad Co.* 85 id. 269.

In *West Chicago Street Railroad Co.* v. *Coit, supra,* the plaintiff was a passenger on the cable car going east, and alighted at the crossing of Madison street while his car was in motion.  He passed around behind the car from which he had alighted, and as he did so, a car coming from the west on the track over which he was about to pass struck him and inflicted injury.  The negligence relied upon was the failure to ring a bell.  Declaration demurred to.  Appellate Court held that it could not say, as a matter of law, under the state of facts, that it was the duty of the defendant to ring the bell, inasmuch as he was not a passenger on the car that struck him, and the servants in charge of that car had no knowledge that he had been a passenger on any car of the company or was about to cross the track.  The case of *Williams* v. *Chicago and Alton Railroad Co. supra,* was that of a plaintiff who was plowing in his field near a road crossing, and alleged the statutory requirement to ring a bell and sound a whistle eighty rods from the crossing, a failure to do that, and that in consequence of such failure his horses became frightened by the sudden approach of the train and injured him.  This court held that he was not upon the highway and the defendant company owed him no duty, and speaking of the statute added:  "The persons whose safety and protection are contemplated by this phraseology are those who use the highway and those who are passengers upon the passing train."  The cases of *Theobald* v. *Chicago, Milwaukee and St. Paul Railway Co.,* and *Bjork* v. *Illinois Central Railroad Co. supra,* were both cases where the plaintiffs were injured in crossing

a railroad having a number of tracks and trains running on two or more of the tracks, and in each case the court held that by the exercise of ordinary prudence the plaintiffs could and should have seen the trains that wrought the injury, in time to avoid the same, and that the failure to ring the bell was not the proximate cause of the injury.

It seems to us these cases are not applicable to the questions involved in the suit at bar. In all the cases cited, where the defendant owed any duty at all to the plaintiff, it was only that of ordinary care. (2 Thompson's Com. on Negligence, sec. 1376.) At the conclusion of that section, speaking of the duty between street railroad companies and persons driving on the street, the author says: "Each party in the use of the highway is bound to exercise ordinary and reasonable care, diligence and caution, such as the circumstances require, to avoid colliding with the other." Such is the duty that existed between Sweeney and appellant. But appellant owed a much higher duty than that of ordinary care to appellee. "The carrier shall do all that human care, vigilance and foresight can reasonably do, consistently with the mode of conveyance and the practical operation of the road." (*Pittsburg, Cincinnati and St. Louis Railway Co.* v. *Thompson*, 56 Ill. 138; *Chicago, Peoria and St. Louis Railway Co.* v. *Lewis*, 145 id. 67.) Mr. Thompson, in his new work on Negligence, (vol. 2, sec. 2100,) stating the duty of the carrier to the passenger, says: "Not ordinary, but extraordinary, diligence is required as to passengers, and the company is responsible for the utmost care and watchfulness and answerable for the smallest negligence."

The duty, then, of appellant is not to be measured by the relative rights of Sweeney and appellant, but by the rights arising from the relation existing between appellant and appellee. There is no pretense that appellee was not using all the care she could use for her own safety, and the question that was presented to the jury

was, did appellant use all the care for the safety of appellee that it was its duty to use under the circumstances of the case? While it may be that appellant could say to Sweeney, "You have no right to complain; you knew our train was running on this track at that particular time, and near to you, and ordinary care required that you use reasonable effort to avoid injury, and that reasonable effort would have required you to have driven off our track, or when off to have remained off until we passed with our train," yet appellee had a right to demand and rely upon appellant exercising every act that human care, vigilance and foresight could reasonably do, consistent with the operation of its road, to avoid injury to her, and we are unable to say that the court should have instructed the jury that it was not appellant's duty to ring the bell or do any other and every other act that was calculated to avoid this injury. This is especially so in view of the fact that the train was running at full speed, and that it is not pretended that appellant's servants in charge of the train did not know that Sweeney was on the track or that they did not see him. The declaration contained a general charge of negligence in the running and operating the train, and it was a question of fact for the jury to determine whether, under all the facts and circumstances, appellant was guilty of such negligence as made it liable; but appellant insisted that the court ought to instruct the jury, as a matter of law, that the failure to ring the bell was immaterial,—which meant the same as to say that the failure to ring the bell was not negligence. This, we think, the court was not warranted in doing under the evidence in the case, and that he properly refused the instruction asked.

The next contention is, that this verdict should have been set aside and the case now reversed upon what appellant terms the misconduct of the jury. The evidence in this case upon that question fails to show any misconduct on the part of the jury. That question was pre-

sented to the court by the affidavits, the substance of
which is set out in this opinion, and the trial court must
have found that there was no sufficient evidence before
it to show that any juror had anything to do with that
letter, nor that it did or could in any way have influenced
the jury, or any member of it, in its consideration of or
vote upon the case. The Appellate Court affirmed this
judgment, and we regard the question as to what irregu-
larity or impropriety, if any, there was that crept into
or emanated from the jury, as a question of fact. The
Appellate Court affirmed the judgment of the trial court,
and thereby affirmed its action in overruling the motion
for a new trial. Having affirmed it, the Appellate Court
was not required to make a special finding of facts in its
judgment, and without looking to its opinion, the pre-
sumption of law would be that it found the facts in all
material respects the same as the trial court. The strong-
est inference that could be possibly drawn from these
affidavits on this motion for a new trial is, that the juror
Biddy had a suspicion that the juror Korf had been tam-
pered with by appellant or somebody in its interest, but
there is no evidence tending to show that he communi-
cated that suspicion to any other juror or that it in any
way affected the verdict; nor does it show, or tend to
show, that any juror was in fact approached by anybody,
or that the juror Biddy had any ground upon which to
base any such suspicion. He swore that he did not write
the anonymous letter, had no knowledge of it, and that
no person communicated with him concerning the case
until after the verdict was read in open court; and treat-
ing the question of fact as an open one for our consid-
eration, we are unable to say, from the affidavits in the
record, that there was any sufficient evidence to warrant
the conclusion that any of the jurors had anything to do
with this letter. While it is the duty of the trial court
to jealously watch the jury and to carefully scrutinize
all its acts, and whenever it appears than any influence

was used with the jury, or any member of it, that was calculated to prejudice him or them for or against the party in whose interest it was made, to set aside a verdict that might by any reasonable possibility be the result of such improper influence, the courts must not interfere with verdicts upon the mere suspicion that it is possible that some member of the jury might have entertained a suspicion touching some other member of the jury.

After a careful examination of the case we are satisfied with the judgment of the Appellate Court, and it is affirmed.                                    *Judgment affirmed.*